**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| In re Tupperware Brands Corporation Securities Litigation | No. 6:20-cv-00357-31-GJK<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |
|---|---|

1. Lead Plaintiff Srikalahasti M. Vagvala ("Plaintiff"), by and through his attorneys, individually and on behalf of all other persons similarly situated, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tupperware Brands Corporation, analysts' reports and advisories about the Company, interviews with witnesses, and information readily obtainable on the Internet. Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2. This is a federal securities class action against Defendants Tupperware Brands Corporation ("Tupperware" or "Company"), E.V. "Rick" Goings ("Goings"), Patricia A. Stitzel ("Stitzel"), Michael Poteshman ("Poteshman"), Cassandra Harris ("Harris"), and Luciano Garcia Rangel ("Rangel"), on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Tupperware from January 31, 2018 through February 24, 2020, both dates inclusive ("Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

3. During the Class Period and with the knowledge of senior Tupperware executives, Tupperware's Fuller Mexico operating unit ("Fuller") engaged in a scheme to falsify the financial results it furnished to Tupperware. Fuller knowingly recorded fake sales, improperly increasing its Class Period revenue by 60%. Senior Fuller executives, themselves, approved shipping product that sales representatives had not ordered and would return, including to dead sales representatives.

4. The Fuller scheme directly and materially impacted the consolidated financial results Tupperware publicly disclosed. Prior to the Class Period, Tupperware had impaired goodwill and other intangibles relating to Fuller's flagging performance. Because of the pre-Class Period impairment, Defendants knew that Fuller's failure to meet sales targets would require Tupperware to further impair the Fuller goodwill and intangibles dollar-for-dollar below those sales targets. In turn, any such material impairment would materially weaken Tupperware's consolidated balance sheet, requiring charges against earnings. Fuller's improper scheme directly forestalled a necessary impairment of both Fuller's goodwill and tradename value to $0 and a dollar-for-dollar decrease in Tupperware's consolidated net income from that necessary impairment.

5. On October 30, 2019, before the market opened, Tupperware disclosed that it had impaired the entirety of the remaining $17.5 million in Fuller goodwill, resulting in a $0.36 decrease in GAAP earnings per share ("EPS"). In addition, without elaboration, Tupperware materially "increased reserves for accounts receivable and inventory in its Fuller Mexico beauty business as a result of lower collections and higher sales returns." These increased reserves further adversely impacted Tupperware's adjusted EPS by $0.13 per share. On this news, investors bid down the price of Tupperware common stock by $5.38 per share, or 35%, to close at $10.16 per share on relatively high trading volume.

6. Then, on February 24, 2020, Defendants disclosed that Tupperware had impaired the remaining intangible assets of Fuller, requiring another charge to Tupperware's 2019 income totaling $40 million. In addition, Tupperware disclosed an "investigation into its Fuller Mexico business primarily regarding the accounting for accounts payable and accrued liabilities." In response, investors bid down the market price of Tupperware common stock by $2.61 per share, or over 45%.

7. Fuller, one of Tupperware's six major brands, is a cosmetics company selling direct-to-consumer in Mexico, Central America, and South America. Mexico accounts for 90% of Fuller's sales. From 2011, Fuller reported to Tupperware poor cash flow and revenue results. In response, in 2017 Tupperware impaired over $62 million in Fuller goodwill, over 75% of Fuller's total goodwill. Defendants knew that if sales remained weak, they would have to impair over $60 million more of both Fuller goodwill and the value of Fuller's tradename.

8. In 2017 Tupperware named Defendant Rangel as Tupperware's "Group President – Latin America,"[1] and Evaristo Hernandez ("Hernandez") as Fuller's new "Managing Director," effectively Fuller's CEO or President. In July 2017, Defendant Goings, Tupperware's CEO, told analysts that Hernandez had previously headed Fuller's marketing during Fuller's "halcyon days." Goings added that since

[1] Rangel was promoted to Group President from his previous position as "Senior Vice President and President Latin America," where he oversaw, among other operations, Fuller Mexico.

their appointment Tupperware had seen "positive signs" that the new management team was "exerting its influence over not only the marketing plans but the sales plans as well."

9. Unable to improve Fuller's financial results by legal means, however, Rangel and Hernandez implemented a scheme to increase Fuller's revenue by faking large volumes of sales. Multiple former employees confirm that Fuller management—including Hernandez with Rangel's express approval—told the sales force to increase total sales materially beyond actual customer orders. If those fake sales proved insufficient to meet Tupperware's targets, Fuller management, including Hernandez, himself, added additional fake sales using what Fuller employees commonly referred to as a "red button" that management had installed in Fuller's software, listing the fraudulent sales on invoices as "anticipated sales." Executives from Tupperware headquarters in Orlando, including Defendant Rangel, knew about, directed, and encouraged the fraudulent scheme.

10. Fuller furnished its materially false financial results to Tupperware's corporate headquarters in Orlando quarterly. Both Hernandez and Defendant Rangel reviewed the Fuller financial results and approved furnishing the Fuller financials before Fuller transmitted them from its software for upload to the Longview software program employed in corporate headquarters in Orlando.

11. Fuller's sales force, made up of independent contractors, had to pay for the products they ordered for delivery to customers, so Fuller recognized revenue from the fraudulent sales as soon as the products were shipped from its warehouse. Because they had not actually ordered the products, the sales force returned material amounts of product to Fuller's warehouse within weeks that were simply re-packaged and returned to inventory. The fraudulent sales accounted for up to 60% of Fuller's recorded revenues during the Class Period. Only by materially and falsely increasing Fuller's sales numbers in 2018 and through the first half of 2019 were Defendants able both to report that Fuller was performing better than forecasted and to avoid impairing Fuller's remaining goodwill and tradename value. But for the false sales numbers, Fuller's actual performance would have required Tupperware to impair both by the beginning of the Class Period.

12. Throughout the Class Period, therefore, in violation of Generally Accepted Accounting Principles ("GAAP") and SEC regulations, by failing to impair those assets, Defendants caused Tupperware knowingly or recklessly to misrepresent the Company's goodwill and net tradenames materially. As a direct result, in further violation of GAAP, Defendants caused Tupperware to materially overstate its operating income, net income, and earnings per share in each periodic income statement during the Class Period.

13. Tupperware's October 30, 2019 and February 24, 2020 disclosures caused stock price declines, and caused members of the Class to suffer damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district, and Tupperware's headquarters are in this judicial district.

18. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails,

interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19. Lead Plaintiff Vagvala purchased Tupperware securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20. Defendant Tupperware is incorporated in Delaware with its principal executive offices located at 14901 South Orange Blossom Trail, Orlando, Florida. Tupperware's securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "TUP."

21. Tupperware operates as a direct-to-consumer marketer of various products across a range of brands and categories. Tupperware's Fuller reporting unit manufactures and sells cosmetics and related household items such as mirrors, and is the fourth largest direct-to-consumer cosmetics seller in Mexico. The large majority of Fuller's sales are in Mexico. Tupperware's other brands, Avroy Shlain, NaturCare, Nutrimetics, and Nuvo, manufacture and distribute skin and hair care products, cosmetics, bath and body care, toiletries, fragrances, jewelry, and nutritional products in Europe, Africa, the Middle East, the Asia Pacific, North America, and South America.

22. Defendant Goings served as Tupperware's Chief Executive Officer ("CEO") from 1997 until May 9, 2018. During the Class Period Goings signed the following SEC filings: February 27, 2018 Form 10-K for the period ended December 30, 2017 ("2017 10-K"); May 1, 2018 Form 10-Q for the 13 weeks ended March 31, 2018 ("1Q 2018 10-Q"). In addition, during the Class Period, Goings signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attached as exhibits to the following SEC filings: 2017 10-K; 1Q 2018 10-Q.

23. Defendant Stitzel served as Tupperware's CEO and Lead Director from May 9, 2018 until November 11, 2019. Defendant Stitzel served as Tupperware's President and Chief Operating Officer ("COO") from September 2016 until May 9, 2018. During the Class Period Stitzel signed the following SEC filings: July 31, 2018 Form 10-Q for the 13 weeks ended June 30, 2018 ("2Q 2018 10-Q"); November 2, 2018 Form 10-Q for the 13 weeks ended September 29, 2018 ("3Q 2018 10-Q"); February 26, 2019 Form 10-K for the period ended December 29, 2018 ("2018 10-K"); May 2, 2019 Form 10-Q for the 13 weeks ended March 30, 2019 ("1Q 2019 10-Q"); August 1, 2019 Form 10-Q for the 13 weeks ended June 29, 2019 ("2Q 2019 10-Q"); November 6, 2019 Form 10-Q for the 13 weeks ended September 28, 2019 ("3Q 2019 10-Q"). In addition, during the Class Period, Stitzel signed SOX certifications attached as exhibits to the following SEC filings: 2Q 2018 10-Q; 3Q 2018 10-Q; 2018 10-K; 1Q 2019 10-Q; 2Q 2019 10-Q; 3Q 2019 10-Q.

24. Defendant Poteshman served as Tupperware's CFO and Executive Vice President from November 2003 until March 31, 2019 and provided consulting services from March 31, 2019 to September 30, 2019. During the Class Period Poteshman signed the following SEC filings: 2017 10-K; 1Q 2018 10-Q; 2Q 2018 10-Q; 3Q 2018 10-Q; 2018 10-K. In addition, during the Class Period, Poteshman signed SOX certifications attached as exhibits to the following SEC filings: 2017 10-K; 1Q 2018 10-Q; 2Q 2018 10-Q; 3Q 2018 10-Q; 2018 10-K.

25. Defendant Harris has served as Tupperware's Chief Financial Officer ("CFO") and Executive Vice President since April 1, 2019. During the Class Period Harris signed the following SEC filings: 1Q 2019 10-Q; 2Q 2019 10-Q; 3Q 2019 10-Q; 2019 10-K. In addition, during the Class Period, Harris signed SOX certifications attached as exhibits to the following SEC filings: 1Q 2019 10-Q; 2Q 2019 10-Q; 3Q 2019 10-Q; 2019 10-K.

26. Defendant Rangel began working at Tupperware in 1999. He was Group President for Latin America from March of 2017 until January 27, 2020. He reported directly to Defendant Stitzel, and then to Stitzel's replacement. He worked out of Tupperware's Orlando, Florida headquarters. Rangel's senior position within Tupperware mandated he file an SEC Form 4 each time he bought or sold Tupperware securities. The Form 4s report that Rangel was a Tupperware "Officer," and his title was "Group President." On January 27, 2020, Tupperware filed with the

SEC a Form 8-K, announcing "that Luciano Garcia Rangel, Group President, Latin America, will leave the Company effective immediately." Defendant Rangel's LinkedIn profile lists no subsequent employment.

27. Defendant Rangel is one of Tupperware's senior officers. An April 5, 2019 Schedule 14A proxy statement, filed with the SEC, states that "Luciano Garcia Rangel's Group President, Latin America role was elevated to the executive officer level on January 1, 2018. The document states that Defendant Rangel is one of only six "Named Executive Officers" in all of Tupperware.

28. Defendants Goings, Stitzel, Harris, Poteshman, and Rangel are sometimes referred to herein as the "Individual Defendants."[2]

29. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

30. The Individual Defendants:

(a) directly participated in the management of the Company;

(b) participated in and oversaw the day-to-day operations of the Company at the highest levels;

[2] The initial complaint included Christopher D. O'Leary ("O'Leary"), Tupperware's interim CEO from November 12, 2019 until March 12, 2020, as an Individual Defendant. Mr. O'Leary was removed as a Defendant from the Consolidated Amended Complaint, without prejudice.

(c) were privy to confidential, proprietary information concerning the Company and its business and operations;

(d) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) were aware of or recklessly disregarded that the Company was issuing false and misleading statements; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

31. In each SOX Certification referenced in this Amended Complaint contains the signatory certified that:

> 1. I have reviewed this [Quarterly or Annual] Report on Form [10-Q or 10-K] of [Defendant Tupperware Brands Corporation];
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial

> condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ….

32. In addition, for each periodic report Tupperware filed with the SEC, it included a Certification of Periodic Financial Report Pursuant to 18 U.S.C. Section 1350, stating:

> I, ________, the chief executive/financial officer of Tupperware Brands Corporation, certify that, to the best of my knowledge, (i) the Form 10-[K/Q] for the [year/quarter] ended _________ fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained

> in such Form 10-[K/Q] fairly presents, in all material respects, the financial condition and results of operations of Tupperware Brands Corporation.

33. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

34. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

35. According to its 2017 10-K, Tupperware "is a global direct-to-consumer marketer of premium, innovative products across multiple brands and categories through an independent sales force of 3.2 million." Its six brands are Tupperware (plastic containers), Fuller Cosmetics (cosmetics products), Avroy Shlain (beauty products), NaturCare (beauty products), Nutrimetrics (cosmetics products), and Nuvo (beauty, fashion, houseware, and Tupperware products).

36. About its sales, Tupperware stated:

> The Company's products are distributed worldwide primarily through the "direct-to-consumer" method, under which products are sold by an independent sales force to consumers outside traditional retail store locations. The

> system facilitates the timely distribution of products to consumers, without having to work through retail intermediaries, and establishes uniform practices regarding the use of Tupperware Brands' trademarks and administrative arrangements, such as order entry, delivery and payment, along with the addition and training of new sales force members.
>
> Products are primarily sold directly to distributors, directors, managers and dealers ("sales force") throughout the world. Where distributorships are granted, they have the right to market the Company's products using parties and other non-retail methods and to utilize Tupperware Brands' trademarks, pursuant to certain limitations. The vast majority of the sales force members are independent contractors and not employees of Tupperware. In certain limited circumstances, the Company has acquired ownership of distributorships for a period of time, until an independent distributor can be installed, in order to maintain market presence.
>
> In addition to the introduction of new products and development of new geographic markets, a key element of the Company's strategy is expanding its business by increasing the size of its sales force. Under the system, distributors, directors, team leaders, managers and dealers add, train, and motivate a large number of dealers. Managers are developed from among the dealer group, and team leaders from among the manager group, and promoted to assist in adding, training and motivating dealers, while continuing to sell products.
>
> As of December 30, 2017, the Company's distribution system had approximately 2,100 distributors, 112,300 managers (including directors and team leaders) and 3.2 million dealers worldwide.

37. In 2005, Tupperware purchased Fuller as part of its acquisition of the direct-to-consumer businesses of Sara Lee Corporation. Fuller is not connected in

any way to the Fuller Brush company. Like Avon, Fuller sells cosmetics and fragrances direct to consumers through a sales force whom its website calls "Fullerettes." In 2017 Fuller was one of six Tupperware business units with at least $100 million in sales. Fuller sells approximately 90% of its products in Mexico. Fuller products are also sold in Central and South America.

38. All of Tupperware's business units reported directly to Defendant Stitzel since September 2016.

**Fuller's 2017 Goodwill Impairment**

39. From 2011 through 2017, Fuller's local currency (Mexico) sales declined by an average of 5% per year. In April and May of 2017, Fuller's sales, profit, and cash flow trends worsened significantly. Tupperware concluded that these trends were a "triggering event for [goodwill] impairment," and performed an impairment analysis.

40. On August 1, 2017, Tupperware filed its Form 10-Q for the 13 weeks ended July 1, 2017 ("2Q 2017 10-Q"). Defendants stated that:

> the sales, profitability and cash flow of Fuller Mexico had fallen below its recent trend lines and would fall significantly short of previous expectations for the year. As a result, the Company performed an interim impairment test as of the end of May 2017, recording an impairment charge of $62.9 million. The impairment evaluation of the goodwill associated with the Fuller Mexico reporting unit involved comparing the fair value of the reporting unit to its carrying value, including the

> goodwill balance, after consideration of impairment to its long-lived assets.

41. Defendants warned that if Fuller sales did not improve, then Tupperware would have to impair "the remaining goodwill balance of $18.9 million." Tupperware told investors that it considered the remaining Fuller goodwill to be "significant relative to total equity," *i.e.*, material to Tupperware's financial statements.

42. Having impaired over 75% of the Fuller goodwill carrying value, Fuller no longer had a "cushion" of excess of fair value over the carrying amount to avoid future impairment. As of the impairment date Fuller's fair value was equal to its carrying value, and Defendants stated that "should the Company's programs and strategies to improve the key performance indicators" not improve, Fuller had a "high risk of future impairment to the remaining goodwill balance."

43. When it partially impaired Fuller goodwill in 2017, Tupperware forecasted revenue and cash flows for the next ten years, and 3% growth thereafter. The cash flow forecast was "most sensitive," because the cash flow forecasts "provide the basis for the estimate of fair market value" for any future goodwill impairment analysis. As Tupperware stated in the 2Q 2017 10-Q, if Fuller's "operating performance [was] significantly below current expectations, including changes in projected future revenue, profitability and cash flow," carrying value would lag behind fair value, and, without the cushion provided by the now-impaired

$62.9 million, Tupperware would have to impair goodwill dollar-for-dollar for the amount Fuller's carrying value was lower than fair value. As of the beginning of the Class Period, therefore, Defendants knew that to avoid impairing assets and absorbing a material hit to Tupperware's income statement and shareholders' equity, Fuller must meet the sales targets Defendants set. They knew, too, that it could not.

**The Fuller Fraudulent Sales Scheme**

44. Throughout the Class Period, Fuller's fake sales scheme succeeded in artificially boosting Fuller's sales and artificially increasing Tupperware's stock price, enabling Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename and to overstate profits on its income statements.

45. To turn Fuller's poor sales around, in 2017 Tupperware appointed Defendant Rangel as Group President – Latin America, and appointed Hernandez as Fuller's Managing Director—equivalent to its CEO or President. In scripted remarks during a July 26, 2017 earnings conference call, evidencing Defendants' focus on Fuller, Defendant Goings touted the new team, stating that Hernandez previously headed marketing at Fuller during its "halcyon years" and that the new team was now "exerting its influence over not only the marketing plans but the sales plans as well."

46. Understanding that he could not improve sales and meet Defendants' targets for Fuller, at least in the short term, Hernandez, with Rangel's knowledge

and direction, implemented a scheme to increase Fuller's revenues by simply faking material sales, and recording revenue from those fake sales. As the independent sales force, the Fullerettes, technically bought, and paid for, the products they ordered and then delivered to end-users, Fuller recognized revenues as soon as it shipped products from its warehouse.

47. Because Fuller was falling materially short of the sales targets Defendants had set to avoid further impairment of Fuller, under Hernandez's direction, Fuller instructed its "coordinators," one level above the Fullerettes, to increase the amount of all sales by a material amount beyond what Fullerettes had actually ordered. Fuller's senior personnel, including Hernandez, then materially increased false sales even further to meet Fuller's operating targets. Fuller shipped the materially inflated orders to Fullerettes. Since the Fullerettes had not ordered a material portion of those products, they returned them to Fuller. Notwithstanding knowing that orders were fraudulently inflated and that Fullerettes would return what they had not ordered, Fuller improperly booked those sales as revenue, falsely meeting or exceeding Defendants' sales targets.

48. Multiple former Tupperware and Fuller employees confirm the pervasiveness of the fraudulent sales scheme at Fuller.

49. Former Employee 1 ("FE1") was a Fuller Divisional Sales Director in charge of seven geographic sales districts in Mexico from October of 2018 through

May of 2019. He reported to Hilda Lopez, Regional Sales Director. FE1 described Fuller's sales hierarchy, with dealers at the bottom ("Fullerettes"), a coordinator above overseeing multiple Fullerettes, then a zone manager in charge of the sales force in a single geographic district, and then divisional directors such as FE1, in charge of multiple geographic sales districts.

50. After being hired FE1 immediately noticed that Fuller was fabricating sales and recognizing revenue on product that it never actually sold. FE1 learned that when Hernandez became Fuller's Managing Director in 2017, he instituted and oversaw the scheme to fabricate sales. According to FE1, Fuller's "upper management" insisted that Fuller meet the sales targets upper management set by any and all means. FE1 described the fraudulent sales as an ongoing Fuller method of doing business, rather than a single or isolated act of a low-level employee.

51. According to FE1, Hernandez and Fuller implemented two layers of fraudulent sales. First, Fuller insisted that the coordinators at the bottom of the sales hierarchy materially inflate sales made by the Fullerettes, usually by simply adding high-value products. Then, more senior Fuller managers, from divisional directors up to Hernandez himself, activated what most Fuller employees colloquially referred to internally as the "red button." The "red button" referred to an alteration that had been made in the internal software, the same software used in Fuller company-wide. When senior Fuller personnel "pressed" the red button, they automatically added

material quantities of a specific product to every Fullerette's confirmed order until Fuller met sales targets.

52. FE1 directly heard both Hilda Lopez, his direct report, and Cesar Vera, Fuller's National Executive Sales Director, tell the managers below them to "actionate," which meant to add products to confirmed orders. FE1 also directly heard several divisional directors, including Niza Lopez from the Oaxaca district, Ileana Gonzalez from the Puebla district, and Lucy Ruiz from the Merida district, state on several occasions that they were going to "activate the red button." FE1 never falsified orders despite Hilda Lopez and Cesar Vera directly pressuring him to do so. The pressure soured FE1's relationship with Lopez and contributed to FE1's decision to leave Fuller.

53. Even with the fraudulent sales, Fuller's revenues were unimpressive. Defendants responded by simply increasing the volume of fake sales. When FE1 began working at Fuller, approximately 60% of Fuller's total sales amount was *real*, and 40% fake. By the time FE1 left, approximately 60% of Fuller's total sales amount was *fake*, and only 40% real.

54. Though Fuller reported to Orlando higher 2018 sales than the previous year, FE1 stated that the fake sales rendered those reported results materially inaccurate. After FE1 left Fuller, former colleagues told FE1 that the fraudulent sales scheme continued until Hernandez left Fuller in November of 2019.

55. In March 2019, Fuller hired FE2 as a Demand Planning and Sales and Operations Planning Manager, working in part with Fuller's inventory. FE2 remained at Fuller through April 2020. Alvaro Martinez Carrillo, Fuller's Marketing and Merchandising Director, hired FE2 and was FE2's direct report. FE2 was based in Mexico City, where Fuller's headquarters were located.

56. Like FE1, soon after beginning at Fuller FE2 learned of the fraudulent scheme materially and artificially to inflate sales. According to FE2, Fuller labeled the fraudulent sales "unusual" or "special" sales. Colleagues told FE2 that the scheme started in 2017. Among FE2's focuses relating to demand planning was an understanding of Fuller's inventory. Upon beginning employment, FE2 learned that Fuller had excess inventory, and was told that this resulted from inaccurate sales forecasts. Within a short time, however, FE2 concluded that the problem was not inaccurate forecasts, but that a high percentage of products that left inventory were returned within 2-3 weeks after shipping. Consistent with FE1's statement, FE2 stated that 60% of the shipped products came back, *i.e.*, they were fake sales. Once returned, the products were eventually re-packaged, and entered back into the inventory.

57. Because Fuller knew that Fullerettes had the right to and would return so many products that it had booked as revenue, according to FE2 senior executives rigged Fuller's computer system so that orders of certain products did not

automatically trigger the system to request a manufacturer to ship products to Fuller's warehouse. FE2 learned that this practice pervaded and that Fuller implemented it in 2017. Further, according to FE2, when products from fake sales were returned to the warehouse, the Credit Note that was issued was not registered in BPICS, Fuller's inventory control software. The products sat in the warehouse waiting to be re-packaged. Fuller processed returns of fake sales products several weeks into the new reporting period, leading to excessive inventory levels, and an increase in inventory obsolescence in future periods.

58. Indeed, acknowledging the pervasiveness of fake sales, senior Fuller executives required that they be told the actual sales numbers, apart from the fake sales. According to FE2, Vice President of Operations and Supply Chains Carlos Mendoza ordered FE2 to break out the real sales numbers from the "unusual" sales numbers every day. Further, according to FE2, the entire company was involved in meeting sales and revenue targets through fake sales, and "everyone" in the company knew about the scheme. According to FE2, Hernandez and Defendant Rangel both knew about the fraudulent sales scheme. In addition, Alvaro Martinez (Marketing and Merchandising Director), Carlos Mendoza (Vice President of Operations and Supply Chains), and Tonatiuh Reyes (Vice President of Human Relations), also all knew about the fraudulent sales scheme.

59. FE3 worked at Fuller as Procurement Manager from September 2017 through April 2019. FE3 initially reported to Operations Director Carlos Mendoza, and then after Mendoza's promotion to Victor Mocho. FE3 stated that Keith Haggerty, Vice President of Operations for Tupperware in Orlando, was at the top of FE3's reporting chain.

60. As Procurement Manager, FE3 was responsible for buying raw materials, and procuring packaging and shipping supplies for Fuller's products. FE3 was also responsible for safety at the manufacturing plant and so visited it every day. The manufacturing plant and warehouse were both located in the same facility.

61. FE3 stated that every fifteen days Fuller would produce a new catalog for its sales representatives to use to sell products. Fuller's marketing team produced these catalogs, providing them to FE3 to use in deciding what and how much to purchase and manufacture.

62. According to FE3 the fake sales scheme was ongoing since at least late 2017. According to FE3 Fullerettes ordered products, paying up front. Fuller marketing personnel simply added to each shipment and invoice products that Fullerettes had not ordered. At the direction of the marketing team, with the knowledge of Alvaro Martinez, the manufacturing team shipped the unordered products to Fullerettes. According to FE3, Fuller recognized revenue when the products left its warehouse. Notwithstanding that Fullerettes did not order the

products it had shipped, Fuller routinely listed these fake sales on invoices as "anticipated sales."

63. Fuller knew too that Fullerettes quickly rejected the unordered products. According to FE3, Fullerettes returned the unordered products unopened within weeks of receiving them, and the returned products filled up the warehouse. According to FE3, personnel regularly stored unopened returned boxes in racks above the manufacturing floor, obvious for all to see.

64. FE4 worked at Fuller from March of 2001 until July of 2019. FE4 was the Divisional Director for the Puebla district, and before that oversaw the Oaxaca and Tlaxcala districts. FE4 reported to Marta Solis, Regional Sales Director, and before Ms. Solis to Elizabeth Hernandez, also Regional Sales Director.

65. According to FE4, Fuller implemented the fake sales scheme in 2017 at the direction of Managing Director Hernandez and Defendant Rangel. Confirming FE1's description, according to FE4, as 2018 progressed the amount of fake sales increased as Fuller's actual sales declined. For example, in the fourth quarter of 2018, one Fuller sales division had real orders worth Mex$3 million pesos, but Fuller shipped products worth Mex$8 million pesos – Mex$5 million worth of fraudulently recognized revenues, 62.5% of the value of the shipped products.

66. According to FE4, Fuller executives Hernandez, Cesar Vera, CFO Nestor Vargas, Marta Solis, and Elizabeth Hernandez each knew about the

fraudulent sales scheme. In one instance, Fuller sent unordered products to a dead Fullerette. Rather than immediately canceling the order, Fuller delivered the products to the dead Fullerette's coordinator.

67. According to FE4, Marta Solis attended and discussed weekly sales meetings. Every Monday morning Hernandez led a meeting that Marta Solis, Tonatiuh Reyes, Nestor Vargas, Cesar Vera, and Elizabeth Hernandez attended. Marta Solis, FE4's boss, regularly informed FE4 about the substance of these weekly meetings. Generally, the meetings involved monitoring sales performance and discussions about the fraudulent sales scheme.

68. FE5 worked at Fuller from April 2015 through October 2016, and then from October 2017 through April 2020. FE5's last job at Fuller was as a Promotions Analyst, dealing with incentives given to Fullerettes as motivation for achieving sales targets. He reported to Laura Pulido, the Director of Promotions, Incentives, and Events. Before that FE5 was a Senior Demand Planner.

69. FE5 confirmed the fraudulent sales scheme. FE5 participated in quarterly "Associate Meetings." The Vice President of each Fuller department attended, including Nestor Vargas from Accounting, Michael Amador from Marketing, Carlos Mendoza from Operations, Tonatiuh Reyes from Human Resources, and an executive from the IT department. Each Vice President spoke at each meeting, discussing sales and sales trends over time. FE5 stated that

participants in Associate Meetings routinely discussed the discrepancies between the reported sales figures and the actual sales figures in 2017, 2018, and 2019.

70. FE5 directly observed that the sales figures did not take into account the returned products, which remained in the sales totals. FE5 further noted that Fuller never made public the true sales figures, without the returned products. FE5 stated that "everyone" from the Finance, Sales, and Marketing departments knew that the sales numbers were materially false.

**Defendant Rangel Knew About and Directed the Fuller Fraudulent Sales Scheme**

71. Senior Tupperware executives in Orlando, specifically Defendant Rangel, not only knew about, but *directed* the Fuller fraudulent sales scheme, along with Hernandez. Further Keith Haggerty, Tupperware's Vice President of Operations in the Americas, knew about the details of the fake sales scheme.

72. According to FE4, Cesar Vera, Fuller's National Executive Sales Director, stated that both Hernandez and Defendant Rangel directed the fake sales scheme. FE4 heard Vera say this during a weekly sales meeting Vera conducted with divisional directors, regional directors, and coordinators, most of whom attended via Zoom video conference. The meeting took place in either October 2018 or January 2019. The meetings had been quarterly but were later made weekly because of poor sales performance. According to FE4, all of FE4's fellow divisional directors knew that both Defendant Rangel and Hernandez were leading the fake sales scheme.

73. FE4 asked Vera to put the instructions to fake sales in writing because it was causing the coordinators to go into debt, which FE4 states that Vera knew. Vera refused, telling FE4 that the fake sales had to continue, and that if FE4 did not do so FE4 would have to make a decision, which FE4 understood to mean continue the fake sales or resign.

74. FE4 further states that in a private discussion with Fuller CFO Nestor Vargas in December 2018, Vargas told FE4 that even though Vargas thought that the fake sales scheme was "unsustainable," Hernandez and Defendant Rangel insisted it continue, stating that "you can't turn around a ship in the middle of the trip." The conversation occurred during a coffee break and began with FE4 telling Vargas about difficulties with reaching sales targets. Vargas responded that he too was concerned because of the large amounts of returned products. After the conversation FE4 approached FE4's boss, Marta Solis, to voice concerns. Solis told FE4 that sales targets had to be reached "even if they had to sell their souls."

75. FE2 stated that Defendant Rangel, one of Tupperware's most senior officers, directly knew of the fraudulent sales scheme. According to FE2, in April of 2019 Defendant Rangel came to Mexico and held a "town hall" with Fuller employees in the company parking lot, attended by members of every Fuller department. Referring to the fake sales scheme, of which FE2 stated everyone was aware, Defendant Rangel stated that Tupperware wanted to keep things "as they

were," and while he knew that some employees had questions or concerns, the system was there "for the sake of the company."

76. FE4 also attended the same April 2019 town hall attended that Defendant Rangel led. According to FE4, Fuller convened the meeting primarily to discuss growing staff discontent with the pressure to "push" unordered product onto Fullerettes that they would not be able to sell. Similarly, FE1 attended a quarterly sales meeting in February or March of 2019 where Defendant Rangel told the meeting participants to "do what the company required."

77. According to FE3, Hernandez reported directly to Defendant Rangel in Orlando, and Defendant Rangel visited Fuller at least twice a year. FE3 remembers that Defendant Rangel attended a town hall in late 2018 and told attendees that the business was improving and to continue the efforts in 2019.

78. Tupperware senior executive Keith Haggerty also knew about the Fuller fraudulent sales scheme. FE6 was Fuller's Vice President for Human Resources and worked at Fuller from 2011 until April 2020. FE6 stated that Haggerty reports directly to William Wright, Tupperware's Executive Vice President, Product Innovation and Supply Chain. FE6 stated that Haggerty visited Fuller quarterly to review its operations and financial results for Orlando.

79. According to FE2, in June or July of 2019, FE2, Haggerty, and Fuller's Carlos Mendoza convened a meeting at which they discussed, in detail, the

fraudulent sales scheme and its ramifications for operations. Haggerty, Mendoza, and FE2 discussed that Fuller "pushed" unordered products onto Fullerettes. FE2 told Haggerty directly that, in turn, Fullerettes returned excessive amounts of product and that Fuller inventory had swelled and that it needed to reduce inventory. Haggerty, Mendoza, and FE2 specifically discussed Fullerettes' excessive product returns, the deadlines for returned products to be re-packaged and returned to inventory, and a plan to re-use 35-50% of the returned products to cut production costs. FE2 stated that Haggerty and Mendoza had frequent meetings, with Haggerty travelling to Mexico every 1-2 months. FE3 confirmed Haggerty's frequent visits to Mexico.

80. FE6 stated that Haggerty was aware of and knew about every aspect of Fuller's business, including "inventory, production costs, and returns," that Haggerty "knew everything about restructuring," and that Haggerty "knew every movement" within Fuller.

81. FE3 stated that representatives from Tupperware's Orlando-based finance team visited Fuller twice annually.

82. FE4 participated in a leadership meeting hosted by Defendant Stitzel in 2018 in Puerto Vallarta, Mexico. Stitzel told the attendees that she "expected better results" from Fuller. Also attending the meeting were Fuller executives Hernandez, Cesar Vera, Hilda Lopez, Tonatiuh Reyes, Marta Solis, and Elizabeth Hernandez.

83. Throughout the Class Period, Fuller's real sales were insufficient to meet Tupperware's targets and, in turn, to boost Tupperware's balance sheet and enable it to avoid impairing Fuller's goodwill and tradename value. The only way that Fuller could turn around its poor performance was through a fraudulent scheme to fake up to 60% of its "sales." Only through these fake sales did Tupperware avoid impairing the remainder of Fuller's goodwill and tradename value and maintain its artificially high stock price.

**Defendant Rangel and Hernandez Both Reviewed and Approved the Quarterly Fuller Financial Results Before they were Furnished to Orlando**

84. According to FE1, Hernandez worked closely with Fuller CFO Nestor Vargas, and nothing happened at Fuller without Hernandez's knowledge. According to FE1, it would be unusual for any communications from Fuller to Orlando to occur without Hernandez's knowledge and approval. Further, according to FE1, Hernandez's communications with Orlando went through Defendant Rangel, who worked closely with Hernandez.

85. According to FE6, Hernandez approved the sales figures before they could be furnished to corporate headquarters in Orlando.

86. FE7 worked for Tupperware's USA & Canada division from February 2009 until his retirement in May 2018. FE7 was a senior financial analyst responsible for financial planning and budgeting for the USA & Canada division and was, for a

period, the division's manager of financial planning and analysis. FE7 was based in Orlando. FE7 reported to the USA & Canada Director of Financial Planning, who reported to the USA & Canada CFO, who reported to the President of USA & Canada, who reported to the Group President. At the outset of FE7's tenure, the position of Director of Financial Planning was vacant. Subsequently, Janet D'Anjou, Amy Hardman, and Oksana Collura each occupied that position. The USA & Canada CFO position was held by Jane Garrard and Burt Shield. During FE7's time with Tupperware, the President of USA and Canada position was held by Defendant Rangel, Kanwar Bhutani, and Stein Ove Fenn.

87. According to FE7, the various global divisions did not all use the same financial software. The USA & Canada division used Oracle software for general accounting but other divisions did not. The Czech Republic division, for example, submitted its financials to Tupperware's corporate offices in an Excel spreadsheet.

88. According to FE7, the President of the USA & Canada division was ultimately responsible for the division's financials, and all of the USA & Canada division's CFO, its President, *and* the Group President would review and approve the quarterly financial numbers before they were transmitted to the corporate offices. Once approved, by, finally, the Group President, the quarterly financial results were uploaded to Tupperware's corporate offices in Orlando, to a program corporate used call Longview, formerly known as Helix. Corporate headquarters would then review

the results and ask questions as necessary. The financial results were then consolidated with results from other divisions using the Longview software.

89. Defendant Rangel himself was President of Tupperware USA & Canada from June 2010 to July 2012, and according to FE7, Rangel reviewed the USA & Canada financials each quarter, and the financials were only furnished to Tupperware's corporate headquarters following his review and approval. According to FE7, as Group President of Latin America, it was Defendant Rangel's responsibility to review and approve Fuller's financials and the financials of the other divisions in the Latin America group before Fuller could furnish those financial results to Orlando.

**The Fraudulent Sales Scheme Allowed Tupperware to Avoid Impairing Fuller's Goodwill and its Tradename Value During the Class Period**

90. On January 31, 2018, Tupperware filed a Form 8-K entitled "Tupperware Brands Reports Fourth Quarter 2017 Results." The Company noted that Fuller sales were down only 1% in the fourth quarter despite impacts from natural disasters that occurred at the end of the third quarter of 2017.

91. The January 31, 2018 8-K made no mention of the fraudulent sales scheme that began after Hernandez became Fuller's Managing Director in March of 2017, or of the effect of the fraudulent revenue on achieving sales that were only 1% down.

92. On that same day, Tupperware held an earnings conference call ("January 31, 2018 Call") to discuss its fourth quarter 2017 results. During the call Defendant Stitzel stated, in scripted remarks, that:

> I'm happy to report that we see continued progress in our business in Fuller Mexico. On a comparable basis, they achieved modest sales growth in Q4, but after a history of declining trends. So they strengthened their product lines, their promotional execution and most importantly, they have restored confidence in the sales organization. So while it's not a turnaround story, positive momentum appears to have returned there, and now our job is to sustain it and to continue to grow the sales organization.

93. In touting the "modest sales growth" and the "strengthened … promotional execution" in the fourth quarter of 2017, Stitzel made no mention of the fraudulent sales scheme that began after Hernandez became Fuller's Managing Director in March of 2017, or of the effect of those fake sales on achieving the sales growth.

94. On February 27, 2018, Tupperware filed its 2017 10-K, with SOX certifications signed by Defendants Goings and Poteshman. Setting out the facts of the May 2017 goodwill impairment, Tupperware stated that "Fuller Mexico's performance in the second half of 2017 was not out of line with assumptions built into the fair value evaluation performed as of the end of May 2017." Tupperware noted that the only reporting unit with a "significant foreseeable risk of failing a future goodwill impairment test" is Fuller, if "actual results [are] below forecasted

results." With no mention of the impact on Fuller's performance of the fraudulent sales scheme, Tupperware did not perform a goodwill impairment test. Tupperware further stated that "the Company's definite-lived intangible asset relates to the Fuller tradename." Tupperware chose not to impair the Fuller tradename.

95. In the 2017 10-K Tupperware did not disclose the Fuller fraudulent sales scheme, or the effect of the fake sales on the announced result of "Fuller Mexico's performance in the second half of 2017" being "not out of line with assumptions built into the fair value evaluation performed as of the end of May 2017."

96. On April 9, 2018, Tupperware filed a Form 8-K entitled "Tupperware Brands Updates First Quarter Guidance." Despite Defendant Goings stating that "we are disappointed with the results of the first quarter," with respect to Fuller Tupperware stated that "we also returned to solid growth at Fuller Mexico, our largest beauty unit."

97. In the April 9, 2018 Form 8-K, Tupperware did not disclose the Fuller fraudulent sales scheme, or the effect of the fake sales on Fuller's "return[] to solid growth."

98. On April 25, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports First Quarter 2018 Results." Tupperware announced "good results" from Fuller, with sales up 7% in local currency.

99. On April 25, 2018, Tupperware held an earnings conference call ("April 25, 2018 Call") to discuss its first quarter 2018 results. Despite announcing that overall the Company's sales were down 6% in the quarter and did not meet expectations, in scripted remarks, Defendant Stitzel, after calling Fuller a "bright spot within Tupperware," stated that:

> Fuller has also been a positive story for us, with our strategy coming together here as well as it has been in process for some time. They were up 7% in Q1. And we now have a solid and experienced management team there, who have been staying the course and building on the work that we started a couple of years ago, with the rebranding, updating the merchandising and the product proposition to add energy to every campaign and boost the sales force morale. We're also revamping the field manager opportunity. Now it's likely too early to claim victory, but we're really encouraged with this trend.

100. On May 1, 2018, Tupperware filed its 1Q 2018 10-Q, with SOX certifications signed by Defendants Goings and Poteshman. Tupperware announced that overall sales decreased 2% from 2017 first quarter sales. The Company noted a "meaningful increase," however, in Fuller sales, which it attributed to "enhanced merchandising and product propositions" and "more efficient promotional spending."

101. In the April 25 8-K, the April 25, 2018 Call, and the 1Q 2018 10-Q, Tupperware did not disclose the Fuller fraudulent sales scheme, or the effect of the fake sales on Fuller's "meaningful increase" in sales. Further, Tupperware did not

discuss or impair any of the remaining Fuller goodwill value, or the value of the Fuller tradename.

102. On July 25, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Second Quarter 2018 Results." Tupperware noted that Fuller sales were up 6% in local currency.

103. On July 25, 2018, Tupperware held an earnings conference call ("July 25, 2018 Call") to discuss its second quarter 2018 results. Announcing that overall sales were down 2% in local currency, CEO Stitzel, in scripted remarks, noted that "Fuller Mexico turned in its third straight quarter of growth.

104. On July 31, 2018, Tupperware filed its 2Q 2018 10-Q, with SOX certifications signed by Defendants Stitzel and Poteshman. The Company noted "significant sales increases" in Fuller, and "more efficient promotional spending." Tupperware stated that "enhanced merchandising and product propositions" were part of the reason for Fuller's positive results.

105. In the July 25, 2018 8-K and earnings call, and in the 2Q 2018 10-Q, Tupperware did not disclose the Fuller fraudulent sales scheme, or the effect of the 40-60% of fake sales on Fuller's "significant sales increase." Further, Tupperware did not discuss or impair any of the remaining Fuller goodwill value, or the value of the Fuller tradename.

106. On October 24, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Third Quarter 2018 Results." The press release noted that Fuller sales were down 1% in local currency in the third quarter of 2018.

107. On October 24, 2018, Tupperware held an earnings conference call ("October 24, 2018 Call") to discuss its third quarter 2018 results. In scripted remarks, Defendant Stitzel blamed the 1% decrease in "softer" Fuller sales on temporary factors, namely "the disruption around the presidential election."

108. On November 2, 2018, Tupperware filed its 3Q 2018 10-Q, with SOX certifications signed by Defendants Stitzel and Poteshman. The Company announced that it had performed its annual assessments of goodwill and intangible assets for all of its reporting units, and "conclude[ed] that there were no impairments." Discussing goodwill and intangible assets, Tupperware stated that "[s]ince May 2017, Fuller's local currency sales and cash flows have exceeded those projected at the May 2017 step 1 valuation, which has significantly reduced the risk of impairment at Fuller Mexico."

109. In the October 24, 2018 8-K and earnings call, and in the 3Q 2018 10-Q, Tupperware did not disclose the Fuller fraudulent sales scheme, or the effect of the fake sales on Fuller's performance. Further, Tupperware did not discuss the impact the fake sales had on its impairment analysis of the remaining Fuller goodwill value, or the value of the Fuller tradename.

110. On January 30, 2019, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Fourth Quarter 2018 Results." The press release noted that Fuller sales were down 9% in local currency, and blamed the shortfall on "a lower active sales force," "reflecting soft response to promotional offers."

111. On January 30, 2019, Tupperware held an earnings conference call ("January 30, 2019 Call") to discuss its fourth quarter 2018 results. In scripted remarks, Defendant Stitzel stated that "Fuller Mexico experienced low single-digit sales growth for the full year for the first time in 8 years."

112. In touting Tupperware's "low single-digit sales growth" in 2018, Stitzel made no mention of the fraudulent sales scheme that began after Hernandez became Fuller's Managing Director in 2017, or of the effect of those fake sales on achieving the low single-digit sales growth.

113. On February 26, 2019, Tupperware filed its 2018 10-K, with SOX certifications from Defendants Stitzel and Poteshman. The Company noted that since the May 2017 forecasts, Fuller's local currency sales and cash flows had exceeded those projected in the May 2017 Step 1 valuation, which had significantly reduced the risk of impairment at Fuller. Tupperware no longer foresaw *any* significant risk that Fuller's remaining goodwill might need to be impaired, stating that "[m]anagement has concluded there is no significant risk of failing a future

goodwill impairment test." Tupperware made no mention of Fuller's fraudulent sales scheme, or the relevance of up to 60% of Fuller's sales being fake on the conclusion that there was no significant risk that Fuller's remaining goodwill would need to be impaired. Tupperware did not perform a goodwill impairment test, and also did not impair the Fuller tradename in the fourth quarter of 2018.

114. On April 24, 2019, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports First Quarter 2019 Results." The press release noted "significant decreases" in Fuller's sales, which were down 11% in local currency in Q1 2019, which the Company blamed on a "lower active sales force" due to "a national fuel shortage."

115. On April 24, 2019, Tupperware held an earnings conference call ("April 24, 2019 Call") to discuss its first quarter 2019 results. In scripted remarks, Defendant Stitzel blamed the significant downturn in Fuller's sales on the gasoline shortage. Further, new CFO Defendant Harris stated that Fuller had one of the "largest volume decreases" of any Tupperware reporting unit.

116. On May 2, 2019, Tupperware filed its 1Q 2019 10-Q, with SOX certifications signed by Defendants Stitzel and Harris. Tupperware noted Fuller's "significant sales decrease" in the quarter. Tupperware further noted Fuller's "increased bad debt expense." Fuller included "bad debt expense," which includes items in accounts receivable that the Company has concluded will never be paid and

are removed from "accounts receivable," in its income statements in the line item "delivery, sales and administrative expenses" ("DS&A").

117. In the April 24, 2019 8-K and earnings call, and in the 1Q 2019 10-Q, Tupperware did not disclose the Fuller fraudulent sales scheme, or the effect of the fake sales on Fuller's performance. Tupperware also did not discuss the impact the fake sales had on its decision not to conduct an impairment analysis of the remaining Fuller goodwill value, or the value of the Fuller tradename. Further, Tupperware did not discuss the impact of the fraudulent sales scheme on the increasing "bad debt expenses."

118. On July 24, 2019, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Second Quarter 2019 Results." The press release contained no substantive information about Fuller's performance in 2Q 2019, nor did it discuss Fuller's remaining goodwill or the value of the Fuller tradename.

119. On July 24, 2019, Tupperware held an earnings conference call ("July 24, 2019 Call") to discuss its second quarter 2019 results. Defendants did not even mention Fuller, goodwill, tradename, or impairment.

120. On August 1, 2019, Tupperware filed its 2Q 2019 10-Q, with SOX certifications signed by Defendants Stitzel and Harris. Tupperware noted Fuller's "significant sales decrease" in the quarter. Tupperware further noted Fuller's "less active and less productive sales force."

121. In the July 24, 2019 8-K and earnings call, and in the 2Q 2019 10-Q, Tupperware did not disclose the Fuller fraudulent sales scheme, or the effect of the fake sales on Fuller's performance. Further, Tupperware did not discuss the impact the fake sales had on its decision not to conduct an impairment analysis of the remaining Fuller goodwill, or the value of the Fuller tradename.

122. But for the Fuller fraudulent scheme to fake sales, Fuller's continued poor financial performance would have forced Tupperware to impair Fuller's goodwill and tradename value by the beginning of the Class Period. In turn, by avoiding impairing Fuller's goodwill and tradename value earlier, Defendants forestalled the accompanying material, adverse impact on Tupperware's balance sheet and income statement. When Defendants disclosed that Fuller's poor performance caused Tupperware to impair first its remaining goodwill and then its remaining tradename value, Tupperware's stock price fell precipitously. Thus, Fuller's fraudulent scheme directly and artificially inflated Tupperware's stock price.

**Tupperware's Financial Statements During the Class Period were Materially Inaccurate**

123. During the Class Period, as a direct result of the fake sales scheme at Fuller, Tupperware's financial statements were materially false because they failed to impair Fuller's goodwill and tradename. The following charts summarize the misstatements as they relate to Fuller's goodwill and tradename value:

| In millions, except per share amounts | Year Ended Dec 30, 2017 | 13 Weeks Ended Mar 31, 2018 | 13 Weeks Ended Jun 30, 2018 | 13 Weeks Ended Sep 29, 2018 | Year Ended Dec 29, 2018 | 13 Weeks Ended Mar 30, 2019 | 13 Weeks Ended Jun 29, 2019 | 13 Weeks Ended Sep 28, 2019 |
|---|---|---|---|---|---|---|---|---|
| Trademarks and tradenames, net | | | | | | | | |
| As reported | $ 62.5 | $ 63.1 | $ 57.2 | $ 55.7 | $ 52.9 | $ 52.3 | $ 50.8 | $ 46.0 |
| Fuller tradename impairment | (34.9) | (31.8) | (29.9) | (28.0) | (26.1) | (25.7) | (23.9) | $ (22.1) |
| Adjusted | $ 27.6 | $ 31.3 | $ 27.3 | $ 27.7 | $ 26.8 | $ 26.6 | $ 26.9 | $ 23.9 |
| *Overstated %* | *126%* | *102%* | *110%* | *101%* | *97%* | *97%* | *89%* | *92%* |
| Goodwill | | | | | | | | |
| As reported | $ 78.9 | $ 81.9 | $ 76.9 | $ 77.2 | $ 76.1 | $ 77.5 | $ 77.4 | $ 58.5 |
| Fuller goodwill impairment | (17.4) | (17.4) | (17.4) | (17.4) | (17.1) | (17.1) | (17.1) | - |
| Adjusted | $ 61.5 | $ 64.5 | $ 59.5 | $ 59.8 | $ 59.0 | $ 60.4 | $ 60.3 | $ 58.5 |
| *Overstated %* | *28%* | *27%* | *29%* | *29%* | *29%* | *28%* | *28%* | *0%* |

| In millions, except per share amounts | Year Ended Dec 30, 2017 | 13 Weeks Ended Mar 31, 2018 | 13 Weeks Ended Jun 30, 2018 | 13 Weeks Ended Sep 29, 2018 | Year Ended Dec 29, 2018 | 13 Weeks Ended Mar 30, 2019 | 13 Weeks Ended Jun 29, 2019 | 13 Weeks Ended Sep 28, 2019 |
|---|---|---|---|---|---|---|---|---|
| Operating income | | | | | | | | |
| As reported | $ 229.1 | $ 69.0 | $ 99.4 | $ 67.2 | $ 319.8 | $ 58.2 | $ 68.8 | $ 19.9 |
| Fuller tradename impairment | (34.9) | (31.8) | (29.9) | (28.0) | (26.1) | (25.7) | (23.9) | (22.1) |
| Fuller goodwill impairment | (17.4) | (17.4) | (17.4) | (17.4) | (17.1) | (17.1) | (17.1) | - |
| Adjusted | $ 176.8 | $ 19.8 | $ 52.1 | $ 21.8 | $ 276.6 | $ 15.4 | $ 27.8 | $ (2.2) |
| *Overstated $* | *$ 52.3* | *$ 49.2* | *$ 47.3* | *$ 45.4* | *$ 43.2* | *$ 42.8* | *$ 41.0* | *$ 22.1* |
| *Overstated %* | *30%* | *248%* | *91%* | *208%* | *16%* | *278%* | *147%* | *NM* |
| Net income (loss) | | | | | | | | |
| As reported | $ (265.4) | $ 35.7 | $ 63.8 | $ 39.1 | $ 155.9 | $ 36.9 | $ 39.4 | $ 7.8 |
| Fuller tradename impairment | (34.9) | (31.8) | (29.9) | (28.0) | (26.1) | (25.7) | (23.9) | (22.1) |
| Fuller goodwill impairment | (17.4) | (17.4) | (17.4) | (17.4) | (17.1) | (17.1) | (17.1) | - |
| Adjusted | $ (317.7) | $ (13.5) | $ 16.5 | $ (6.3) | $ 112.7 | $ (5.9) | $ (1.6) | $ (14.3) |
| *Overstated $* | *$ 52.3* | *$ 49.2* | *$ 47.3* | *$ 45.4* | *$ 43.2* | *$ 42.8* | *$ 41.0* | *$ 22.1* |
| *Over(under)stated %* | *-16%* | *NM* | *287%* | *NM* | *38%* | *NM* | *NM* | *NM* |
| Diluted earnings (loss) per share | | | | | | | | |
| As reported | $ (5.22) | $ 0.70 | $ 1.26 | $ 0.79 | $ 3.11 | $ 0.76 | $ 0.81 | $ 0.16 |
| Fuller tradename impairment | (0.69) | (0.62) | (0.59) | (0.57) | (0.52) | (0.53) | (0.49) | (0.45) |
| Fuller goodwill impairment | (0.34) | (0.34) | (0.34) | (0.35) | (0.34) | (0.35) | (0.35) | - |
| Adjusted | $ (6.26) | $ (0.26) | $ 0.33 | $ (0.13) | $ 2.25 | $ (0.12) | $ (0.03) | $ (0.29) |
| *Overstated $* | *$ 1.04* | *$ 0.96* | *$ 0.93* | *$ 0.92* | *$ 0.86* | *$ 0.88* | *$ 0.84* | *$ 0.45* |
| *Over(under)stated %* | *-17%* | *NM* | *285%* | *NM* | *38%* | *NM* | *NM* | *NM* |

*NM* - not meaningful

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

124. During the January 31, 2018 earnings call to discuss the results in the fourth quarter of 2017, Defendant Stitzel stated:

> I'm happy to report that we see continued progress in our business in Fuller Mexico. On a comparable basis, they achieved modest sales growth in Q4, but after a history of declining trends. So they strengthened their product lines, their promotional execution and most importantly, they have restored confidence in the sales organization. So while it's not a turnaround story, positive momentum appears to have returned there, and now our job is to sustain it and to continue to grow the sales organization. So really both our Mexican businesses are in a good place heading into 2018. We know that direct selling is a huge and important channel in Mexico, and the power of our brands and the actions we are taking will continue to provide us an opportunity to take market share there.

125. The foregoing affirmative statement about Fuller's purported increase in sales and the reasons for that purported increase was materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

126. On January 31, 2018, Tupperware filed a Form 8-K and press release entitled "Tupperware Brands Reports Fourth Quarter 2017 Results Declares Regular Quarterly Dividend," including financial statements for the year ended December

30, 2017. In the income statement, Tupperware recorded Operating Income of $229.1 million, Net Loss of $265.4 million, and Diluted Loss per Share of $5.22. In addition, its balance sheet included Net Trademarks and Tradenames of $62.5 million, and Goodwill of $78.9 million.

127. On February 27, 2018, Tupperware filed the 2017 10-K. On the income statement Tupperware recorded Operating Income of $229.1 million, Net loss $265.4 million, and Diluted Earnings per Share of $5.22. On the balance sheet Tupperware recorded Net Trademarks and Tradenames of $62.5 million, and Goodwill of $78.9 million.

128. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated goodwill by $17.4 million and Net Trademarks and Tradenames by $34.9 million;

c. As a direct result of its failure to impair goodwill and tradename for Fuller, on its income statement Tupperware overstated 2017 operating income by $52.3 million, overstated net income by $52.3 million, and overstated diluted earnings per share by $1.04.

129. During the April 25, 2018 call to discuss first quarter 2018 results, Defendant Stitzel stated:

> I'd also like to highlight our businesses in Mexico, both Tupperware and House of Fuller. We're really pleased with the developments in these businesses …. and both show the power of the strategies we have been implementing over the past couple of years …. Fuller has also been a positive story for us, with our strategy coming together here as well as it has been in process for some time. They were up 7% in Q1. And we now have a solid and experienced management team there, who have been staying the course and building on the work that we started a couple of years ago, with the rebranding, updating the merchandising and the product proposition to add energy to every campaign and boost the sales force morale. We're also revamping the field manager opportunity. Now it's likely too early to claim victory, but we're really encouraged with this trend.

130. The foregoing affirmative statement about Fuller's purported increase in sales and the reasons for that purported increase was materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased

sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

131. On April 25, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports First Quarter 2018 Results." The press release stated that "Fuller Mexico sales were up 14% (7% local currency)."

132. The foregoing affirmative statement about Fuller's purported increase in sales and the reasons for that purported increase was materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

133. On May 1, 2018, Tupperware filed its 1Q 2018 10-Q, including financial statements for the quarter ended March 31, 2018. The Company stated that there had been a "meaningful increase" in Fuller sales, which it attributed to "enhanced merchandising and product propositions" and "more efficient promotional spending."

134. The foregoing affirmative statement about Fuller's purported increase in sales and the reasons for that purported increase was materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased

sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

135. The 1Q 2018 10-Q included financial statements for the quarter ended March 31, 2018. Defendants Goings and Poteshman signed the 1Q 2018 10-Q, certifying under SOX the accuracy of the document, including its financial statements. Tupperware did not disclose the Fuller fraudulent revenue scheme and failed to impair either goodwill or the value of Fuller's tradename.

136. In addition, on its income statement, Tupperware recorded Operating Income of $69.0 million, Net Income of $35.7 million, and Diluted Earnings per Share of $0.70. On its balance sheet, Tupperware recorded Net Trademarks and Tradenames of $63.1 million, and Goodwill of $81.9 million.

137. On April 25, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports First Quarter 2018 Results," disclosing the same financial results as quoted above from the 1Q 2018 10-Q.

138. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP

provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated goodwill by $17.4 million and Net Trademarks and Tradenames by $31.8 million;

c. As a direct result of its failure to impair goodwill and tradename for Fuller, on its income statement, Tupperware overstated operating income by $49.2 million, overstated net income by $49.2 million, and overstated diluted earnings per share by $0.96.

139. On the July 25, 2018 Call to discuss its second quarter 2018 results, Defendant Stitzel, in scripted remarks, noted that "both of our businesses in Mexico continue to overcome external headwinds and deliver solid results …. Fuller Mexico turned in its third straight quarter of growth."

140. The foregoing affirmative statement about Fuller's "third straight quarter of growth" was materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

141. On July 25, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Second Quarter 2018 Results." Tupperware noted that Fuller sales were up 6% in local currency.

142. The foregoing affirmative statement about Fuller's purported increase in sales and the reasons for that purported increase was materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

143. On July 31, 2018, Tupperware filed its 2Q 2018 10-Q, including financial statements for the 13 weeks ended June 30, 2018. Defendants Goings and Poteshman signed the 2Q 2018 10-Q, certifying under SOX the accuracy of the document, including its financial statements. In the 2Q 2018 10-Q, the Company noted "significant sales increases" in Fuller, and "more efficient promotional spending." Tupperware stated that "enhanced merchandising and product propositions" were part of the reason for Fuller's positive results.

144. The foregoing affirmative statement about Fuller's purported increase in sales and the reasons for that purported increase was materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased

sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

145. In addition, in the 2Q 2018 10-Q's income statement, Tupperware recorded Operating Income of $99.4 million, Net Income of $63.8 million, and Diluted Earnings per Share of $1.26. On its balance sheet, Tupperware recorded Net Trademarks and Tradenames of $57.2 million, and Goodwill of $76.9 million.

146. On July 25, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Second Quarter 2018 Results," disclosing the same financial results as quoted above from the 2Q 2018 10-Q.

147. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated goodwill by $17.4 million and Net Trademarks and Tradenames by $29.9 million;

c. As a direct result of its failure to impair goodwill and tradename for Fuller, on its income statement, Tupperware overstated operating income by $47.3 million, overstated net income by $47.3 million, and overstated diluted earnings per share by $0.93.

148. On November 2, 2018, Tupperware filed its 3Q 2018 10-Q, including financial statements for the 13 weeks ended September 29, 2018. Defendants Stitzel and Poteshman signed the 3Q 2018 10-Q, certifying under SOX the accuracy of the document, including its financial statements. In the 3Q 2018 10-Q, the Company announced that it had performed its annual assessments of goodwill and intangible assets for all of its reporting units, and "conclude[ed] that there were no impairments." Discussing goodwill and intangible assets, Tupperware stated that "[s]ince May 2017, Fuller Mexico's local currency sales and cash flows have exceeded those projected at the May 2017 step 1 valuation, which has significantly reduced the risk of impairment at Fuller Mexico."

149. The foregoing affirmative statement about "Fuller Mexico's local currency sales and cash flows hav[ing] exceeded those projected at the May 2017 step 1 valuation" was materially false. Tupperware knew or recklessly disregarded that Fuller's sales would not have exceeded the May 2017 step 1 valuation but for

the fake sales scheme. Having disclosed information about Fuller's purported increased sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

150. In addition, in the 3Q 2018 10-Q's income statement Tupperware recorded Operating Income of $67.2 million, Net Income of $39.1 million, and Diluted Earnings per Share of $0.79. On its balance sheet, Tupperware recorded Net Trademarks and Tradenames of $55.7 million, and Goodwill of $77.2 million.

151. On October 24, 2018, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Third Quarter 2018 Results," disclosing the same financial results as quoted above from the 3Q 2018 10-Q.

152. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated goodwill by $17.4 million and Net Trademarks and Tradenames by $28.0 million;

c. As a direct result of its failure to impair goodwill and tradename for Fuller, on its income statement, Tupperware overstated operating income by $45.4 million, overstated net income by $45.4 million, and overstated diluted earnings per share by $0.92.

153. On February 26, 2019, Tupperware filed its 2018 10-K, including financial statements for the period ended December 29, 2018. Defendants Stitzel and Poteshman signed the 2018 10-K, certifying under SOX the accuracy of the document, including its financial statements. In the 2018 10-K, Tupperware announced that since the May 2017 forecasts, Fuller's local currency sales and cash flows had exceeded those projected in the May 2017 Step 1 valuation, which had significantly reduced the risk of impairment at Fuller. Tupperware no longer foresaw *any* significant risk that Fuller's remaining goodwill might need to be impaired, stating that "[m]anagement has concluded there is no significant risk of failing a future goodwill impairment test." The Company did not disclose the Fuller fraudulent revenue scheme and failed to impair either goodwill or the value of Fuller's tradename.

154. The foregoing affirmative statement that Fuller's local currency sales and cash flows had exceeded those projected at the May 2017 step 1 valuation was

materially false. Tupperware knew or recklessly disregarded that Fuller's sales would not have exceeded the May 2017 step 1 valuation but for the fake sales scheme. Having disclosed information about Fuller's purported increased sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

155. In the 2018 10-K's income statement, Tupperware recorded Operating Income of $319.8 million, Net Income of $155.9 million, and Diluted Earnings per Share of $3.11. On its balance sheet, Tupperware recorded Net Trademarks and Tradenames of $52.9 million, and Goodwill of $76.1 million.

156. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated goodwill by $17.1 million and Net Trademarks and Tradenames by $26.1 million;

c. As a direct result of its failure to impair goodwill and tradename for Fuller, on its income statement, Tupperware overstated operating income by $43.2 million, overstated net income by $43.2 million, and overstated diluted earnings per share by $0.86.

157. During the January 30, 2019 Call to discuss Tupperware's fourth quarter 2018 results, in scripted remarks, Defendant Stitzel stated that "Fuller Mexico experienced low single-digit sales growth for the full year for the first time in 8 years," and "Fuller Mexico was up slightly, which was a trend change from recent years."

158. The foregoing affirmative statements about Fuller's purported increase in sales and the reasons for that purported increase were materially false. Tupperware knew or recklessly disregarded that Fuller's sales had not increased but for the fake sales scheme. Having disclosed information about Fuller's purported increased sales, Tupperware was duty bound not to lie about the actual reasons for Fuller's purported sales increase.

159. On May 2, 2019, Tupperware filed its 1Q 2019 10-Q, including financial statements for the 13 weeks ended March 30, 2019. Defendants Stitzel and Harris signed the 1Q 2019 10-Q, certifying under SOX the accuracy of the

document, including its financial statements. In the 1Q 2019 10-Q, the Company noted Fuller's "increased bad debt expense." Fuller's "bad debt expense," included items in accounts receivable that Tupperware had concluded would never be paid and removed from "accounts receivable," in its income statements in the line item "delivery, sales and administrative expenses" ("DS&A").The Company did not disclose the Fuller fraudulent revenue scheme, and failed to impair either goodwill or the value of Fuller's tradename.

160. In addition, on its income statement, Tupperware recorded Operating Income of $58.2 million, Net Income of $36.9 million, and Diluted Earnings per Share of $0.76. On its balance sheet, Tupperware recorded Net Trademarks and Tradenames of $52.3 million, and Goodwill of $77.5 million.

161. On April 23, 2019, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports First Quarter 2019 Results," disclosing the same financial results as quoted above from the 1Q 2019 10-Q.

162. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP

provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated goodwill by $17.1 million and Net Trademarks and Tradenames by $25.7 million;

c. As a direct result of its failure to impair goodwill and tradename for Fuller, on its income statement, Tupperware overstated operating income by $42.8 million, overstated net income by $42.8 million, and overstated diluted earnings per share by $0.88.

163. On August 1, 2019, Tupperware filed its 2Q 2019 10-Q, including financial statements for the 13 weeks ended June 29, 2019. Defendants Stitzel and Harris signed the 2Q 2019 10-Q, certifying under SOX the accuracy of the document, including its financial statements. In the 2Q 2019 10-Q, the Company noted Fuller's "significant sales decrease" in the quarter. Tupperware further noted Fuller's "less active and less productive sales force." Tupperware did not disclose the Fuller fraudulent revenue scheme, and failed to impair either goodwill or the value of Fuller's tradename.

164. In addition, on its income statement, Tupperware recorded Operating Income of $68.8 million, Net Income of $39.4 million, and Diluted Earnings per

Share of $0.81. On its balance sheet, Tupperware recorded Net Trademarks and Tradenames of $50.8 million, and Goodwill of $77.4 million.

165. On July 24, 2019, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Second Quarter 2019 Results," disclosing the same financial results as quoted above from the 2Q 2019 10-Q.

166. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated goodwill by $17.1 million and overstated Net Trademarks and Tradenames by $23.9 million;

c. As a direct result of its failure to impair goodwill and tradename for Fuller, on its income statement, Tupperware overstated operating income

by $41.0 million, overstated net income by $41.0 million, and overstated diluted earnings per share by $0.84.

167. On November 6, 2019, Tupperware filed its 3Q 2019 10-Q, including financial statements for the 13 weeks ended September 28, 2019, 2019. Defendants Stitzel and Harris signed the 3Q 2019 10-Q, certifying under SOX the accuracy of the document, including its financial statements. In the 3Q 2019 10-Q, the Company impaired the remaining $17.5 million of Fuller's goodwill. Tupperware did not disclose the Fuller fraudulent revenue scheme, and failed to impair the value of Fuller's tradename.

168. In addition, on its income statement, Tupperware recorded Operating Income of $19.9 million, Net Income of $7.8 million, and Diluted Earnings per Share of $0.16. In addition, on its balance sheet, Tupperware recorded Net Trademarks and Tradenames of $46.0 million.

169. On October 30, 2019, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Third Quarter 2019 Results," disclosing the same financial results as quoted above from the 3Q 2019 10-Q.

170. The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

a. Through the undisclosed fraudulent revenue scheme, Fuller furnished fraudulent financial results to Tupperware to meet Tupperware

targets. The false financial results enabled Tupperware to avoid impairing Fuller's goodwill and the value of Fuller's tradename, in violation of GAAP provisions ASC 350 and ASC 360. The overstatement of account values on Tupperware's balance sheet directly caused Tupperware to overstate its revenue and operating income, directly and artificially inflating Tupperware's stock price;

b. On its balance sheet, materially overstated Net Trademarks and Tradenames by $22.1 million;

c. As a direct result of its failure to impair the tradename for Fuller, on its income statement, Tupperware overstated operating income by $22.1 million, overstated net income by $22.1 million, and overstated diluted earnings per share by $0.45.

## THE TRUTH BEGINS TO EMERGE

171. On October 30, 2019, just after the market opened, Tupperware filed a Form 8-K with a press release entitled "Tupperware Brands Reports Third Quarter 2019 Results." Tupperware announced that it was impairing the remaining $17.5 million of Fuller's goodwill. The Company finally began acknowledging the effect of Fuller's fraudulent sales scheme, though not explicitly, highlighting that the 3Q 2019 financial results included:

> ***increased reserves for accounts receivable and inventory in its Fuller Mexico beauty business as a result of lower***

> ***collections and higher sales returns.*** These increased reserves negatively impacted Adjusted E.P.S. by $0.13 versus the previously stated guidance. Given the trends in the Fuller Mexico beauty business, an impairment assessment was performed on the recorded goodwill balance resulting in a pre-tax, non-cash goodwill impairment charge of the remaining balance of $17.5 million or $0.36 on GAAP E.P.S.

172. On October 30, 2019, before the market opened, Tupperware held an earnings conference call ("October 30, 2019 Call") to discuss its third quarter 2019 results. Whereas in the previous quarter's July 24, 2019 Call the words Fuller, goodwill, and impairment were never mentioned, Fuller's troubles were front-and-center during the October 30, 2019 Call. Defendant Stitzel's first statement was an acknowledgment that "[p]rofitability was adversely affected by accounting reserves related to our Fuller Mexico beauty business." Defendant Harris, in scripted remarks, noted that Tupperware's net sales were down 11%, then stated that "[t]he Fuller Mexico beauty business had lower collections and ***higher sales returns*** than expected, resulting in increased inventory and accounts receivable reserves, impacting earnings per share by $0.13 versus our guidance."

173. On this news, Tupperware's stock price fell $5.38 per share, or 35%, to close at $10.16 per share on October 30, 2019 on relatively high volume of 8.2 million shares traded.

174. On November 6, 2019, Tupperware filed its 3Q 2019 10-Q, with SOX certifications signed by Defendants Stitzel and Harris. Tupperware explained the process behind the Fuller goodwill impairment:

> The impairment evaluation of the goodwill associated with the Fuller Mexico reporting unit involved comparing the fair value of the reporting unit to its carrying value, including the goodwill balance, after consideration of impairment to its long-lived assets. There were no impairments of any long-lived assets. The fair value analysis for Fuller Mexico was completed using the income approach, which was considered a Level 3 measurement within the fair value hierarchy. The significant assumptions used in the income approach included estimates regarding future operations and the ability to generate cash flows, including projections of revenue, costs, utilization of assets and capital requirements. The income approach, or discounted cash flow approach, also requires an estimate as to the appropriate discount rate to be used. The most sensitive estimate in this valuation is the projection of operating cash flows, as these provide the basis for the estimate of fair market value. The Company's cash flow model used a forecast period of ten years with annual revenue growth rates ranging from negative eight percent to positive four percent, a compound average growth rate of 0.2 percent, and a 2.5 percent growth rate used in calculating the terminal value. The discount rate used was 14.9 percent. The growth rates were determined by reviewing historical results of the operating unit and the historical results of the Company's other similar business units, along with the expected contribution from growth strategies being implemented. As the fair value of Fuller Mexico was less than the carrying value by more than the recorded goodwill balance, the remaining balance of goodwill recorded at Fuller Mexico was written off.

175. Tupperware also noted the negative effect of Fuller's "increased bad debt expenses" on the Company's costs and expenses.

176. Tupperware stated that it had performed an impairment analysis for the Fuller tradename and concluded that no impairment was necessary.

177. The 3Q 2019 10-Q contained specific language in the "Operational Risk" section, regarding conduct and ethics throughout Tupperware, that did not appear in any other quarterly or annual statement during the Class Period:

> The Company maintains systems of internal controls that provide management with timely and accurate information about the Company's operations. These systems have been designed to manage operational risk at appropriate levels given the Company's financial strength, the environment in which it operates, and considering factors such as competition and regulation. ***The Company has also established procedures that are designed to ensure that policies relating to conduct, ethics, and business practices are followed on a uniform basis***. While there can be no assurance that the Company will not suffer losses in the future due to operational errors that the Company discovers, management continually monitors and works to improve its internal controls, systems, and corporate-wide processes and procedures.

178. On November 8, 2019, Tupperware filed a Form 8-K and press release announcing that its Board of Directors had decided to suspend the Company's quarterly common dividend.

179. Tupperware removed Fuller Managing Director Hernandez from his position in November 2019, firing him in January 2020.

180. On November 12, 2019, Defendant Stitzel was replaced as CEO on an interim basis by Christopher O'Leary.

181. On December 3, 2019, Defendant Harris and O'Leary represented Tupperware at the "Morgan Stanley Global Consumer and Retail Conference." Answering a question, Defendant Harris stated that "[w]e did discuss one issue that was driving our bad debt, which was our Fuller businesses, and … there is an intense focus around our receivables. And what we know is that the Fuller business was very different from the other businesses."

182. On January 31, 2020, Tupperware filed a Form 8-K stating that on January 27, 2020, Defendant Rangel left Tupperware, "effective immediately."

183. On February 24, 2020, after the market closed, Tupperware filed a Form 8-K and press release entitled "Tupperware Brands Reports Preliminary 2019 Results." In the press release Tupperware revealed even more on the serious troubles at Fuller. Tupperware stated that it would file a Form 12b-25 Notification of Late Filing with the SEC to extend the filing deadline for the 2019 10-K by fifteen days. The reason for the extension was that it would "provide the Company time to finalize additional procedures as part of ***its investigation regarding the impact of certain financial reporting matters in its Fuller Mexico beauty business*** and to finalize its tax rate as further described below." Tupperware explained that:

> The Company is ***conducting an investigation primarily into the accounting for accounts payable and accrued***

> ***liabilities at its Fuller Mexico beauty business to determine the extent to which these matters may further impact*** results and to assess and enhance the effectiveness of internal controls at this business. This matter is $9-11 million of the total expected $19-21 million full-year impact on an adjusted pre-tax basis. In addition, total impairments for Fuller Mexico are expected to be approximately $31 million. The total pre-tax impact for 2019 is approximately $50- $52 million.

184. The press release noted bluntly that "our preliminary results were further affected by financial reporting issues in Fuller Mexico."

185. In the February 24, 2020 press release Tupperware revealed for the first time that it had impaired Fuller's tradename by $20.3 million.[3] The financial statement listed $40 million in "impairment of goodwill and intangible assets" in fiscal year 2019, of which $17.5 million was the previous quarter's Fuller goodwill impairment, $2.2 million was a 3Q 2019 tradename impairment for a different Tupperware reporting unit, and $20.3 million was impairment of the Fuller tradename.

186. On this news, Tupperware's stock price fell $2.61 per share, or over 45%, to close at $3.11 per share on February 25, 2020, on relatively high volume of 20,409,000 shares traded.

187. On March 12, 2020, Tupperware filed its 2019 10-K. The filing confirmed that the Fuller tradename had been impaired during 2019 by $20.3

---

[3] The filing inadvertently says "trademark" instead of "tradename."

million, all but $6.5 million of the tradename's value. The Company stated that the triggering event had been the "declines in [Fuller's] financial performance." Further, Tupperware eliminated the $18.4 million in Fuller's deferred tax assets due to the declines in Fuller's financial performance. Finally, Tupperware announced that:

> with the help of external legal and accounting resources, [it had] conducted an investigation into its Fuller Mexico business primarily regarding the accounting for accounts payable and accrued liabilities. The Company has completed this investigation and the financial impact of the out of period adjustments in 2019 and 2018, for the annual and interim periods, was immaterial.

188. Tupperware made no mention of Fuller's fraudulent revenue scheme, and provided no specifics as to why, in the absence of material problems with Fuller's sales and revenue policies, it needed to delay filing its 10-K for fifteen days to investigate Fuller's accounts payable.

## DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES AND REGULATIONS

### GAAP and SEC Rules and Regulations - Generally

189. GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

190. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB").

191. The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1.

192. SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), stated that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of those accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

193. SEC rules and regulations require that publicly traded companies such as Tupperware include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X.

**Tupperware Violated SEC Regulations and GAAP by Failing to Impair Goodwill**

194. From the beginning of the Class Period and through the filing of the 2Q 2019 10-Q on August 1, 2019, Defendants violated GAAP in each quarterly and

annual filing by knowingly or recklessly failing to impair goodwill at the Fuller reporting unit.

195. GAAP provision ASC 350-20 applies to accounting and financial reporting for goodwill. Goodwill is defined as "an asset representing the future economic benefits arising from other assets acquired in a business combination." ASC 350-20-20.

196. Goodwill is created in an acquisition and is initially measured as the excess of the purchase price over the value of identifiable assets acquired and liabilities assumed in a business combination. ASC 805-30-30-1. Tupperware's goodwill and intangible assets relate primarily to the December 2005 acquisition of the direct-to-consumer businesses of Sara Lee Corporation.

197. Goodwill is tested for impairment at the reporting unit level. ASC 350-20-35-1. "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value." ASC 350-20-35-2.

198. Once a year, at the same time each year, a company must evaluate goodwill for impairment. ASC 350-20-35-28. It was Tupperware's policy to perform this evaluation in the third quarter of each fiscal year.

199. However, "goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more

likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30. A company must assess "qualitative factors," known as triggering events, to determine if it should perform an interim analysis. ASC 350-20-35-30 and ASC 350-20-35-3C. The "totality" of events and circumstances, including a non-exclusive list of factors included in GAAP, must be evaluated. ASC 350-20-35-3C, ASC 350-20-35-3E.

200. GAAP provision ASC 350-20-35-3C contains a non-exclusive list of examples of events and circumstances which could trigger an interim goodwill impairment test:

> a. Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;
>
> b. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (considered in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;
>
> c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;
>
> d. Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;
>
> e. Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

> f. Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit ….

201. Once a goodwill impairment test is triggered, a company may first perform a qualitative assessment test to determine if it needs to perform a quantitative impairment test. ASC 350-20-35-3–3B. In the 2018 10-K, Tupperware itself defined the qualitative factors it considered as "macro-economic conditions of the local business environment, overall financial performance, sensitivity analysis from the most recent quantitative fair value valuation (fair value test), as prescribed under Accounting Standards Codification ('ASC') 350, Intangibles – Goodwill and Other, and other entity specific factors as deemed appropriate."

202. If necessary, the quantitative impairment test is performed to identify and measure goodwill impairment. ASC 350-20-35-3. The quantitative test compares the fair value of a reporting unit with its carrying amount, also known as the net book value, including goodwill. ASC 350-20-35-4. If the carrying amount (i.e., the amount recorded on the books) exceeds the fair value of the reporting unit, then goodwill is considered impaired and an impairment loss is recognized in an amount equal to the difference between the fair value and carrying value, up to the amount of goodwill allocated to that reporting unit. ASC 350-20-35-6 and ASC 350-20-35-8.

203. In 2Q 2017, Fuller's declining performance, including a worsening of negative sales, profit, and cash flow trends that began in 2011 meant Fuller would fall significantly short of previous expectations for the year, triggering Tupperware to perform an interim impairment test of its Fuller goodwill. Tupperware took a $62.9 million goodwill impairment charge to its Fuller reporting unit.

204. Tupperware's 2Q 2017 impairment analysis relied primarily on a discounted cash flow analysis, which included assumptions regarding Fuller's future ability to generate cash flows, including projections of revenue, costs, utilization of assets, and capital requirements.

205. When it impaired Fuller's goodwill in 2017, Tupperware forecast revenue and cash flows for the next ten years. Notably, the May 2017 cash flow projections forecast that Fuller's sales would see "positive revenue growth" starting in 2019, with "continued four percent growth thereafter."

206. Tupperware acknowledged in its 2Q 2017 10-Q that the $62.9 million goodwill impairment removed any excess, or cushion, of the Fuller reporting units' fair value over its book value. If the future operating performance of the Fuller reporting unit fell below the May 2017 projections, and "the Company's programs and strategies to improve the key performance indicators" failed to reverse the

general trends, then Fuller's remaining $18.9 million[4] goodwill balance was at a high risk of future impairment. Tupperware considered the remaining goodwill to be "significant relative to total equity."

207. As detailed above, during the July 26, 2017 Call, Defendant Goings revealed that at the end of 1Q 2017, Tupperware appointed a new management team at Fuller, with Hernandez the new Managing Director of Fuller.

208. As described in detail above, FE1, FE2, FE3, and FE5 observed a fraudulent revenue scheme, starting in 2017. Both Fuller coordinators and Fuller senior executives, up to and including Hernandez, inflated actual orders by 40%-60% with fictitious orders. As soon as the products not actually ordered were shipped, Fuller recognized the revenue from those "sales." The former employees also described that executives in Tupperware's Orlando headquarters, including Defendant Rangel and Keith Haggerty, knew about and in Rangel's case directed and encouraged the fraudulent revenue scheme.

209. In addition to inflating sales, the fraudulent revenue scheme led to an increase in Fuller's, and Tupperware's, bad debt expense in subsequent reporting periods because accounts receivable recorded for the fictitious sales, returned unopened to Fuller's warehouse, would never be collected.

---

[4] The balance of goodwill at the Fuller Mexico reporting unit fluctuated due to fluctuations in exchange rates.

210. Further, the revenues inflated by fake sales served as the basis for future sales projections, so the sales projections being used in Tupperware's qualitative and quantitative evaluation of goodwill impairment were inflated.

211. FE2 stated that Fuller processed returns of products fictitiously sold several weeks into the new reporting period, leading an to accumulation of excess inventory levels, and an increase in inventory obsolescence expense in future periods.

212. At the end of the Class Period, in the February 24, 2020 8-K and press release, Tupperware admitted other improper accounting practices at Fuller dating as far back as 2018, related primarily to accounting for accounts payable and accrued expenses. Based on the double-entry accounting system, which forms the foundation of financial accounting, if amounts payable are not appropriately recorded on the balance sheet (in either accounts payable or accrued expenses), then related expenses and associated cash outflows are also likely to be misstated, and consequently the Company's cash flow and earnings, reported on the income statement, will be misstated. In the February 24, 2020 press release, Tupperware estimated the impact of these improper accounting practices on 2019 pre-tax earnings as between $9-11 million.

213. In the 2019 10-K, filed on March 12, 2020, Tupperware announced, after an investigation by "external legal and accounting resources, that the improper

accounting practices impacted both its 2018 and 2019 earnings, though Tupperware concluded the financial impact was "immaterial."

214. Fuller's inflated, fraudulent sales figures, inflated sales projections, and other improper accounting manipulations enabled Tupperware to avoid recording additional goodwill impairment charges for the Fuller reporting unit during its annual impairment tests in 2017 and 2018. In the 3Q 2017 10-Q, using the inflated sales numbers, Tupperware concluded that the Fuller reporting unit had met the May 2017 forecast, and that only qualitative assessments were necessary, so Tupperware did not perform a quantitative assessment. In the 3Q 2018 10-Q, again using falsely inflated numbers, Tupperware simply concluded that "there were no impairments." In the 2018 10-K, Tupperware stated that because Fuller's cash flows since May 2017 (buoyed by material amounts of manipulated fake sales) exceeded the forecast, there was "no significant foreseeable risk" of future Fuller goodwill impairments.

215. In its 2018 10-K, Tupperware stated that, as GAAP requires, it reviews its goodwill for impairment annually "or more frequently if events or changes in circumstances indicate they may be impaired." However, because of the fraudulent revenue scheme which allowed Defendants to state that sales and operating results at Fuller were performing in line with projections from the May 2017 assessment,

during the Class Period Tupperware never performed an interim test for impairment of goodwill at the Fuller reporting unit.

216. The May 2017 forecast for 2019 foresaw "positive revenue growth" starting in 2019, with "continued four percent growth thereafter." In 2019, however, despite the material volume of fictitious sales and accounting manipulation, Fuller's sales declined, instead of growing. FE1 stated that the main cause of the decline was the high rotation in sales staff, who actually sell and deliver the products and collected the revenues from the end customer.

217. As noted in detail above, Tupperware admitted that in Q4 2018 Fuller's reported sales were down 9% in local currency, and in Q1 2019 Fuller's reported sales were down 11% in local currency.

218. Further, Defendants admitted that other factors were driving down Fuller sales. During the April 24, 2019 Call, Defendant Stitzel said that Fuller's performance was impacted by gas shortages affecting the mobility of Fuller's field managers. During the July 24, 2019 Call, Stitzel cited to "geopolitical concerns and lower consumer spending" as reasons for Fuller's disappointing sales and revenue.

219. Despite the fraudulent sales and the other macro- and micro-economic factors listed above, Defendants still refused, in violation of GAAP, to perform any interim goodwill impairment tests until the third quarter of 2019.

220. In the 3Q 2019 10-Q, Defendants finally complied with their GAAP obligations. Tupperware stated that "[d]uring the first and second quarters of 2019, the [Fuller] reporting unit began to see declines in sales and profit due to difficult economic and geopolitical trends,"[5] but Tupperware claimed that Fuller was "still projected to meet expectations from the May 2017 assessment." Defendants impaired the entire remaining $17.5 million in Fuller goodwill.

221. Tupperware's claim that there was no need to perform an interim impairment analysis and to impair Fuller's goodwill before 3Q 2019 is false. But for the material fictitious sales, comprising 40-60% of Fuller's revenues, Fuller could not have met the May 2017 assessment expectations in any reporting period starting in the first quarter of 2018. This conclusion is strengthened by other factors including the economic and geopolitical conditions in Mexico, issues with the Fuller sales staff, and Fuller's declining performance. Further, Fuller would have needed increased sales in the second half of 2019 in order to meet the May 2017 forecast of 4% growth in the years after 2019.

222. Tupperware violated GAAP by failing to impair during the entire Class Period. Multiple obvious triggering events were present by the beginning of the

[5] This statement was false. As stated above, Tupperware began to report declining sales at Fuller Mexico in Q4 2018.

Class Period, long before the third quarter of 2019. Here is a non-exclusive list for each quarter:[6]

| **Reporting Periods** | **Triggering Events** |
|---|---|
| -1Q 2018<br>-2Q 2018<br>-3Q 2018<br>-4Q 2018<br>-1Q 2019<br>-2Q 2019 | -Failure to meet the May 2017 projections but for fictitious sales (40-60% of Fuller's recognized revenues) and improper accounting practices.<br><br>-Inability to meet May 2017 projections in the future. |
| -1Q 2018<br>-2Q 2018<br>-3Q 2018<br>-4Q 2018<br>-1Q 2019<br>-2Q 2019 | ASC 350-20-35-3C (d)- Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods |
| -4Q 2018 | ASC 350-20-35-3C (e)- Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation. |
| -4Q 2018 | - Fewer active sellers in Fuller |
| -1Q 2019<br>-2Q 2019 | ASC 350-20-35-3C (a)- Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets.<br><br>ASC 350-20-35-3C (b)- Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the |

[6] 3Q 2018 appears in the chart to show that triggering events existed in that quarter, even though, as the quarter in which Tupperware conducted its required annual impairment testing, no triggering events were required to require an impairment analysis.

| | |
|---|---|
| | market for an entity's products or services, or a regulatory or political development. |
| -1Q 2019<br>-2Q 2019 | -Fuller was impacted by the gasoline shortage in 1Q2019 which began in 4Q2018.<br><br>-Difficult economic and geopolitical trends<br><br>-Uncertainty around the new government in Mexico and Brazil that led to tightened consumer spending. |

223. These triggering events would "more likely than not" negatively impact future revenues, costs, and cash flows, all of which are on the non-exclusive list of triggering events to consider, *see* ASC 350-20-35-3C, and compel an interim goodwill impairment analysis. Only by failing to consider and ignoring the events and circumstances which should have triggered an interim impairment test could Tupperware conclude that no interim goodwill impairment analysis needed to be performed.

224. Further, the triggering events met Tupperware's own list of factors for the qualitative test, namely "macro-economic conditions of the local business environment, overall financial performance, sensitivity analysis from the most recent quantitative fair value valuation (fair value test), as prescribed under Accounting Standards Codification ("ASC") 350, Intangibles – Goodwill and Other, and other entity specific factors as deemed appropriate." Consideration of these factors, including the 40-60% of fake sales that materially distorted "overall financial performance," required Tupperware to perform the quantitative test and to

impair Fuller's goodwill. In violation of GAAP, Defendants knowingly or recklessly failed to impair Fuller's goodwill in each quarter in 2018 and through the first two quarters of 2019.

**<u>Tupperware Violated SEC Regulations and GAAP by Failing to Impair Fuller's Tradename</u>**

225. During the Class Period, Tupperware knowingly or recklessly violated GAAP by failing to impair its Fuller tradename.

226. The Fuller tradename is a "definite-lived intangible asset."[7] Unlike goodwill, it is subject to amortization and there is no annual impairment test requirement. ASC 350-30-35-6. As with goodwill, a company must conduct an impairment analysis for a definite-lived intangible asset upon the occurrence of triggering events, *i.e.*, events or changes in circumstances which indicate that its carrying value may not be recoverable. ASC 350-30-35-14. GAAP provides a non-exclusive list, at ASC 360-10-35-21, of triggering events:

a. A significant decrease in the market price of a long-lived asset (asset group);

b. A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition;

[7] In its 2013 10-K, Tupperware reclassified its Fuller tradename from an indefinite-lived intangible asset to a definite-lived intangible asset because of a long-term transition in the Fuller Mexico business to a new brand name. As a result of the transition, Tupperware determined that the Fuller tradename had a 10 year useful life, ending in August 2023, with amortization to be recorded on a straight-line basis.

> c. A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator;
>
> d. An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group);
>
> e. A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group) ….

227. As described in detail above, Tupperware had fraudulently and materially inflated its Fuller sales since 2017, and, based on the fraudulently inflated numbers, had projected its ability to meet its sales projections.

228. Several triggering factors existed from the start of the Class Period that mandated Tupperware proceed with a tradename impairment analysis each quarter. Factors that trigger goodwill impairment testing also trigger tradename impairment testing because they indicate that the carrying amount of the Fuller tradename may not be recoverable. ASC 360-10-35-21. Therefore, "failure to meet the May 2017 projections but for fictitious sales and improper accounting practices" and "inability to meet May 2017 projections in the future," both of which existed in each and every reporting period during the Class Period, as noted in the goodwill section, above, triggered tradename impairment analysis in each quarter. These triggering events fit within ASC 360-10-35-21(b) ("adverse changes") and ASC 360-10-35-21(e) ("operating or cash flow losses or a projection or forecast that demonstrates

continuing losses”). Other triggering factors mentioned herein affected the “business climate,” *see* ASC 360-10-35-21(c), above, including difficult economic and geopolitical trends, uncertainty around the new governments in Mexico and Brazil that led to tightened consumer spending, fewer active sellers in Fuller, and a gasoline shortage that started in 4Q 2018.

229. The impairment analysis for the Fuller tradename value is a two-step process. In the first step the carrying value of the asset at the end of each reporting period is compared to the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying amount is higher, the asset is not recoverable and an impairment is necessary, and the company must proceed to the second step. ASC 360-10-35-17.

230. Tupperware determined the cash flows expected to be derived from the Fuller trademark using the “relief from royalty” method. The value of the intangible asset is calculated using a “royalty rate,” an estimate of the amount a company would be willing to pay for the use of the asset. The royalty rate is determined by reviewing comparable trademark licensing agreements in the market. The royalty rate is then applied to the projected revenue from sales of Fuller products in different geographical areas, including domestic sales in Mexico, through August 2023, the end of useful life of the Fuller tradename.

231. Without the benefit of Fuller's inflated sales projections, because of the magnitude of the fictitious sales, the undiscounted value of the expected royalties from sales of the Fuller brand products would have been less than the carrying value of the Fuller trademark intangible asset, indicating that its value was not recoverable, and requiring Tupperware to proceed to the second step of the definite-lived intangible asset impairment analysis.

232. In the second step of the impairment analysis Tupperware determines the amount of the required impairment by comparing the carrying amount of the Fuller tradename intangible asset to its fair value, determined using the discounted future cash flows, the same cash flows used in step one, above. ASC 360-10-35-17. If the carrying amount is higher than the fair value, then the company must impair the intangible asset by that amount.

233. For the same reasons as are described above in detail, if Tupperware had not used sales projections that were falsely inflated because of the fraudulent revenue scheme, leading to inflated cash flow projections, it would have had no choice but to impair the value of its Fuller tradename intangible asset when it performed the impairment analysis.

234. When Defendants finally performed an evaluation of the Fuller tradename intangible asset for impairment in Q4 2019, without the benefit of inflated expected sales, they recorded a $20.3 million impairment of the Fuller tradename

intangible asset. Had they performed the analysis at the start of the Class Period, without sales projections buoyed by fake sales of up to 60% of Fuller's total sales, Tupperware would have been required to take the tradename impairment at that time.[8]

235. Defendants violated GAAP, knowingly or recklessly, by failing to impair the amount recorded as the Fuller tradename intangible asset at the start of the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

236. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Tupperware during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, Tupperware's officers and directors, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

[8] Since the value of the tradename intangible asset was amortized over time, the required tradename impairment in 1Q 2018 would have been $31.8 million, lessening over time to $22.1 million in 3Q 2019, the quarter before the actual tradename impairment.

237. The members of the Class are so numerous that joinder of all members is impracticable. As of March 9, 2020, 48,931,022 shares of Tupperware common stock were outstanding and the Company had 33,050 shareholders of record and beneficial owners. Throughout the Class Period, the Company's common stock traded actively on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tupperware or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

238. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

239. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class. In addition, Local Counsel and Lead Counsel satisfy the standards for appointment as class counsel and will fairly and adequately represent the interests of the Class.

240. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Tupperware;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused Tupperware to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of Tupperware's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

241. Common questions of law and fact predominate over any questions affecting only individual Class members. Because the common stock of Tupperware traded in an efficient market and Defendants false and misleading statements had impacted the price of Tupperware common stock, Plaintiff will establish reliance for himself and the Class through the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in an efficient market;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NYSE, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's

securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

242. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market, establishing predominance.

243. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

244. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

245. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## COUNT I
## Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against Tupperware Brands Corporation and Defendant Rangel

246. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

247. Plaintiff asserts this claim against Defendants Rangel and Tupperware, basing the claim upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

248. During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), Defendant Tupperware, by and through its officers, disseminated false and misleading statements, based upon information Rangel, Hernandez, and other senior Tupperware and Fuller officers and employees furnished knowingly or deliberately disregarding that the information contained misrepresentations, omitted material facts, and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

249. Defendants Rangel and Tupperware, by and through Rangel, Hernandez, and other senior Fuller and Tupperware officers and employees, violated §10(b) of the 1934 Act and Rule 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Tupperware's securities and directly impacted the price of Tupperware common stock during the Class Period.

250. Defendants Rangel and Tupperware, by and through Rangel, Hernandez, and other senior Fuller and Tupperware officers and employees, acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in Tupperware's name were materially false and misleading and omitted material information; knew or recklessly disregarded

that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Tupperware, by and through Rangel, Hernandez, and other senior Fuller and Tupperware officers and employees, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Information showing that Tupperware, by and through by and through Rangel, Hernandez, and other senior Fuller and Tupperware officers and employees, acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

251. Defendant Rangel and other senior Tupperware officers knew or recklessly disregarded the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Tupperware personnel to members of the investing public, including Plaintiff and the Class.

252. As a direct and proximate result of the scheme or artifice to defraud that lead directly to Tupperware's disclosing materially false and misleading information, the market price of Tupperware's securities was artificially inflated during the Class Period. In ignorance of the falsity of the statements at issue, Plaintiff and the other members of the Class relied on the statements described above and/or on the integrity of the market price of Tupperware's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Tupperware's false and misleading statements and omissions.

253. Had Plaintiff and the other members of the Class been aware that the market price of Tupperware's securities had been artificially and falsely inflated by the fraudulent scheme that caused Tupperware to issue misleading financial statements, and by the material adverse information which the Company did not disclose, causing artificial inflation in Tupperware's stock price, they would not have purchased Tupperware's securities at the artificially inflated prices that they did, or at all.

254. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

255. By reason of the foregoing, Defendants Tupperware and Rangel have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial

damages which they suffered in connection with their purchases of Tupperware's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

256. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

257. During the Class Period, Tupperware, by and through its officers and directors, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

258. The Individual Defendants participated in the operation and management of Tupperware and its operating units, and conducted and participated, directly and indirectly, in the conduct of Tupperware's business affairs. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tupperware's financial condition and results of operations, and to correct promptly any public statements issued by Tupperware which had become materially false or misleading.

259. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tupperware disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual

Defendants exercised their power and authority over Tupperware. The Individual Defendants, therefore, were "controlling persons" of Tupperware within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tupperware's securities.

260. Each of the Individual Defendants, therefore, acted as a controlling person of Tupperware. By reason of their senior management positions and/or being directors of Tupperware, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause Tupperware to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Tupperware and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

261. By reason of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act and are jointly and severally liable to the Plaintiff and the other members of the Class for substantial damages that they suffered in connection with their purchases of Tupperware's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class representative, and approving Lead Counsel and Local Counsel as counsel to the Class;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 16, 2021

Respectfully submitted,

**SAXENA WHITE P.A.**

/s/ *Brandon Grzandziel*
Brandon Grzandziel
Fla. Bar No. 58732
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Email: brandon@saxenawhite.com

***Local Counsel for Lead Plaintiff and the Class***

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg, *pro hac vice*
Gonen Haklay, *pro hac vice*
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: goldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2020, a true and correct copy of the CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/*Brandon Grzandziel*
Brandon Grzandziel